STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 CA 0820

Consolidated With

2020 CA 0821

VALERIE GOBER

VERSUS

GREG GOBER, SR.

Judgment Rendered:   MAR 1 1 2021

* * * * * *

On Appeal from the Sixteenth Judicial District Court
In and for the Parish of St. Mary
State of Louisiana
No. 131,597

Honorable Lori A. Landry, Judge Presiding

* * * * * *

Nicole Dufrene Streva          Counsel for Plaintiff/Appellee
Morgan City, Louisiana         Valerie Gober


Nicholas F. Larocca, Jr.       Counsel for Defendant/Appellant
Morgan City, Louisiana         Greg Gober, Sr.


* * * * * *

BEFORE:  GUIDRY, McCLENDON AND LANIER, JJ.

**McCLENDON, J.**

A former husband appeals a trial court judgment finding his ex-wife was free from fault for the dissolution of the parties' marriage. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Valerie Hirschmann[1] and Greg Gober were married on June 27, 2009. No children were born of the marriage. Ms. Hirschmann filed a petition for divorce on September 19, 2017. The trial court entered a final judgment of divorce pursuant to LSA-C.C. art. 102 on November 28, 2018.

In connection with the divorce, and at issue in this appeal, Ms. Hirschmann sought an award of final periodic spousal support. In opposition, Mr. Gober argued that Ms. Hirschmann was barred from receiving final support because she was at fault in the breakup of the marriage. Specifically, Mr. Gober claimed that Ms. Hirschmann had unjustifiably accused him of infidelity, refused normal marital relations, and abandoned the marriage.

At the conclusion of an August 20, 2019 hearing, the trial court ruled that Ms. Hirschmann was free from fault for the dissolution of the parties' marriage. A written judgment in conformity with the August 20, 2019 ruling was executed on September 11, 2019. Following a second hearing on September 26, 2019, the trial court set a final support award in the amount of $650.00 per month, with applicable credits. A written judgment memorializing that ruling was executed on October 15, 2019.

In the wake of the trial court's oral ruling awarding final support on September 26, 2019, Mr. Gober filed two appeals. The first appeal, 2020 CA 0820, was filed on October 9, 2019 and sought review of the ruling finding Ms. Hirschmann free from fault as well as the ruling awarding final support. The trial court signed the order of appeal on October 16, 2019. The second appeal, 2020 CA 0821, was filed on October 25, 2019. It noted that "the judgment rendered on September 26, 2019 [that awarded final spousal support] was not signed by the court until October 15, 2019," and accordingly,

---

[1] We note that at the time Ms. Hirschmann filed the petition for divorce, her legal name was Valerie Gober. As she has since resumed the use of her maiden name of Hirschmann, we refer to her as Ms. Hirschmann throughout.

"defendant's appeal of that judgment was premature, and this petition is intended to correct the error and perfect an appeal of the judgment rendered on September 26, 2019, and signed October 15, 2019." The trial court signed the order of appeal on October 25, 2019.

A record was lodged with this Court for each of the two orders of appeal signed by the trial court. The first appeal, 2020 CA 0820[2], was designated as an appeal of the September 11, 2019 judgment finding Ms. Hirschmann free from fault. The second appeal, 2020 CA 0821, was designated as an appeal of the October 15, 2019 judgment awarding final support.[3] Mr. Gober filed a motion seeking to consolidate the two appeals on October 20, 2020, which this Court granted by action dated November 20, 2020.

In these consolidated appeals, Mr. Gober raises the following assignments of error:

1) The trial court erred in finding that Ms. Hirschmann was free from fault and that Mr. Gober was the cause of the parties' divorce.

2) The trial court demonstrated bias and partiality throughout the hearing, and Mr. Gober was therefore denied a fair trial.

## LAW

Louisiana Civil Code article 111 provides that a trial court may award final periodic support to a party free from fault prior to the filing of a divorce proceeding. The factors to consider in determining the amount and duration of final support are set

---

[2] Regarding 2020 CA 0820, this Court, *ex proprio motu*, examined the appellate record and noted that the September 11, 2019 ruling finding Ms. Hirschmann free from fault appeared to be a nonappealable interlocutory ruling. Accordingly, this Court issued a rule to show cause order on October 23, 2020, ordering the parties to show cause by briefs as to why the appeal should or should not be dismissed.

The ruling on fault is not a final appealable judgment. See **Evans v. Evans**, 2002-691 (La.App. 5 Cir. 11/19/02), 833 So.2d 427, 428 (In a dispute regarding final spousal support, a ruling on fault addresses one issue but does not grant a party all or part of the relief prayed for, as the trial court must still make determinations regarding need, ability to pay, and several other factors). Thus, the initial order of appeal was premature when it was initially filed on October 9, 2019.

However, the trial court executed the written judgment awarding spousal support, which was a final judgment on the merits, on October 15, 2019, the day before the order of appeal was signed on October 16, 2019. To the extent that a motion for appeal is premature, any defect arising from a premature motion for appeal is cured once a final judgment has been signed. See **Overmier v. Traylor**, 475 So.2d 1094, 1094-95 (La. 1985) (per curiam); **Chauvin v. Chauvin**, 2010-1055 (La.App. 1 Cir. 10/29/10), 49 So.3d 565, 568 n.1; see also LSA-C.C.P. arts. 1911, 1915, and 1918. Thus, the first appeal was not premature when the order of appeal was signed and is not subject to dismissal. The rule to show cause is dismissed.

[3] Regarding the second appeal, 2020 CA 0821, Mr. Gober filed a motion for partial dismissal, asserting therein that the only ruling he seeks to appeal is the September 11, 2019 ruling finding Ms. Hirschmann free from fault. As the two appeals have been consolidated and raise identical assignments of error regarding the September 11, 2019 fault ruling, the motion for partial dismissal is denied as moot.

forth in LSA-C.C. art. 112. Freedom from fault is a necessary element of a claim for final periodic spousal support, and the burden of proving freedom from fault is on the claimant. **Elbert v. Elbert**, 2008-2139 (La.App. 1 Cir. 5/13/09), 15 So.3d 236, 239, writ denied, 2009-1322 (La. 9/25/09), 18 So.3d 72.

The Civil Code, however, does not define fault. **Brett v. Brett**, 2000-0436 (La.App. 1 Cir. 5/30/01), 794 So.2d 912, 914, writ denied, 802 So. 2d 611 (La. 2001). Since the statutory law does not specifically define fault which would deny final support, legal fault must be determined according to the prior jurisprudential criteria. The jurisprudence specifies the conduct which may be considered fault. Legal fault consists of serious misconduct, which is a cause of the marriage's dissolution. **Allen v. Allen**, 1994-1090 (La. 12/12/94), 648 So.2d 359, 362. To constitute fault sufficient to deprive a spouse of final support, the spouse's misconduct must not only be of a serious nature, but it must also be an independent, contributory, or proximate cause of the separation. **Cauthron v. Cauthron**, 2012-0913 (La.App. 1 Cir. 2/15/13), 113 So.3d 232, 233. Such acts are synonymous with the fault grounds that previously entitled a spouse to a separation or divorce, *i.e.*, adultery, conviction of a felony, habitual intemperance or excesses, cruel treatment or outrages, public defamation, abandonment, an attempt on the other's life, status as a fugitive, and intentional non-support. **Id.** at 233-234. This Court has held that a spouse need not be totally blameless to receive final support. In this imperfect world, all spouses have faults, and a spouse need not be perfect to be free from legal fault. **Hammack v. Hammack**, 1999-2809 (La.App. 1 Cir. 12/22/00), 778 So.2d 70, 73, writ denied, 2001-0913 (La. 5/25/01), 793 So.2d 166.

## STANDARD OF REVIEW

As with any factual finding, a trial court's findings relative to the issue of fault in domestic cases are entitled to great weight and will not be overturned on appeal absent manifest error. **Hammack**, 778 So.2d at 73. The two-part test for the appellate review of facts is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record establishes that the finding is not manifestly erroneous. Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there

was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. **Johnson v. Thomas**, 2013-0081 (La.App. 1 Cir. 12/27/13), 137 So. 3d 632, 636.

## DISCUSSION

As set forth above, Mr. Gober has argued that Ms. Hirschmann was at fault for the dissolution of the marriage and is therefore barred from receiving final support. Mr. Gober contends that Ms. Hirschmann moved into a separate bedroom and withheld normal marital sexual relations because she wrongly, and without reason, believed he was having an affair. Mr. Gober further claims that Ms. Hirschmann abandoned the marriage because she "plotted to leave him" by purchasing a mobile home with community funds and gifting $10,000 of community funds to her children without his knowledge.

The record plainly reflects that the parties engaged in marital relations less frequently as time progressed. Further, there is no dispute that Ms. Hirschmann purchased a mobile home, gifted money to her children, and initiated divorce proceedings without informing Mr. Gober of her actions. However, the parties presented very different explanations for how these events came about.

The record reflects that Ms. Hirschmann's health deteriorated significantly after the parties were married in 2009. Specifically, while Ms. Hirschmann had one back surgery due to degenerative disc disease prior to the parties' marriage, during the marriage she underwent two additional back surgeries, a thyroid removal, and a hysterectomy. Ms. Hirschmann recovered from her second back surgery and was able to return to work. However, Ms. Hirschmann's third back surgery resulted in severe complications. Ms. Hirschmann testified that the surgery "messed up [her] whole right leg, the nerves and all," causing her to walk with a cane. It became more difficult for her to do housework, and she believed her medication caused her to experience fatigue. At this point, Ms. Hirschmann was unable to return to work. She applied for social security disability benefits which were initially denied. However, Ms. Hirschmann's permanent total disability benefits were approved in 2016.

5

When asked, Mr. Gober's testimony regarding Ms. Hirschmann's health was that she "claimed her back was hurting." Mr. Gober also stated that Ms. Hirschmann "wanted to have another operation on her back, which [he] disagreed with and she went and done it anyway."

In 2014, Ms. Hirschmann began sleeping in a separate bedroom.[4] She testified that she was in pain and Mr. Gober moved a lot in his sleep and liked having their two dogs in bed at night, which made it too uncomfortable for her to sleep in the bed with him. She stated that they continued to have sexual relations after she moved into the other bedroom. Mr. Gober claimed that Ms. Hirschmann's move into a separate bedroom has nothing to do with her back surgeries, and that this move precipitated the decline in marital relations. Mr. Gober recalled that the couple had sex about twice a week until Ms. Hirschmann moved into a different bedroom; after that, he testified that they had sex "a handful of times." When pressed by the trial court for more details, Mr. Gober estimated that the parties had sex seven or eight times a year the first year Ms. Hirschmann slept in a separate room, and less often every year following. In 2016, he said they had sex possibly two or three times. Mr. Gober also testified that Ms. Hirschmann wrongly believed he was having an affair, and refused to have sex with him on this basis.

Ms. Hirschmann denied that she withheld sex from Mr. Gober. Though she confirmed that the parties had "less and less" sex over time, she offered numerous explanations for this.[5] Ms. Hirschmann testified that her health problems caused her pain in general, and that sometimes she was capable of having sex and other times she was not. Specifically regarding 2016, Ms. Hirschmann stated that they did not have sex

---

[4] It appears that Ms. Hirschmann sometimes referred to her second and third surgeries within the context of the parties' marriage, i.e., she referred to her second surgery as the first and her third surgery as the second. The record does not indicate the year in which Ms. Hirschmann underwent her second back surgery. However, she consistently testified that she began sleeping in a separate bedroom in 2014, and that she waited for two years to be approved for disability benefits which occurred in 2016. Thus, it appears that Ms. Hirschmann's third back surgery occurred in 2014.

[5] Mr. Gober's counsel impeached Ms. Hirschmann by referring to her deposition testimony, in which she stated that during the five years before the parties got divorced they had sex "a couple of times." During trial Ms. Hirschmann stated that it was "more than couple of times, but you're going to take it literally so... I didn't mean it like that, but you had me so upset that day." The trial court stated "She has explained what she meant during the deposition... I will give it weight when when I compare her testimony and her explanation to the deposition.... You have impeached her, she's given an explanation, let's go on, guys."

6

often because "[she] was in a lot of pain." Nevertheless, Ms. Hirschmann admitted that sometimes she denied Mr. Gober sex because she thought he was having an affair. Ms. Hirschmann also testified that on occasion she asked Mr. Gober to have sex and he declined, and vice versa.

Additionally, Ms. Hirschmann testified that she gained weight after her surgeries and Mr. Gober told her "he didn't want to be with a fat wife." Mr. Gober denied saying this. Sometime thereafter, Ms. Hirschmann found condoms on Mr. Gober's nightstand, behind some books. Ms. Hirschmann explained that this was unusual because the parties had never used condoms, as she had her tubes tied prior to the marriage and she had a hysterectomy during the marriage. She counted the condoms over time and found that there were sometimes less and sometimes more. Ms. Hirschmann also testified that Mr. Gober would leave for hours at a time on errands that she believed should have taken much less time, and that he would refuse to answer her if she asked where he had been. The presence of the condoms combined with Mr. Gober's absences from the home led Ms. Hirschmann to believe Mr. Gober was having an affair. Ms. Hirschmann testified that she confronted Mr. Gober about the condoms the last year they were together. Mr. Gober denied infidelity and told Ms. Hirschmann that he used the condoms for self gratification, which Ms. Hirschmann did not believe. At the hearing, Mr. Gober denied being gone from the home for long unexplained absences and denied infidelity. Mr. Gober also testified that the parties used condoms in foreplay, which Ms. Hirschmann disputed.

Ms. Hirschmann further testified that Mr. Gober smoked marijuana throughout the parties' marriage, despite her requests that he quit. Further, while Mr. Gober only gave Ms. Hirschmann $100 per week and at times would refuse to give her money for her medications, he always "had money for his pot." Ms. Hirschmann asserted that Mr. Gober equated his marijuana use with her prescription pain medicine pills. Mr. Gober testified that he "slowed down" his use of marijuana at Ms. Hirschmann's request in an attempt to improve the marriage, but it did not improve, and "occasionally [he] would

smoke again."[6] Mr. Gober also disputed that he only gave Ms. Hirschmann $100 per week, stating that he gave Ms. Hirschmann $200 per week before she began receiving disability benefits and $100 per week afterwards. The parties both testified that they did not share information with each other regarding the money they received individually.

The parties both testified to high levels of tension during the last few years of the marriage. Ms. Hirschmann stated that despite her health challenges, she did the best she could, but for Mr. Gober, "nothing was ever good enough." She alleged that they were "fighting nonstop over everything." Mr. Gober said "I'd come home from work, and she would jump on me for no reason about something that happened weeks ago and just be furious as soon as I walk[ed] through the door saying that I was a piece of crap. And I didn't understand, you know. And I... had to get my truck and leave to keep from arguing with her."

Ms. Hirschmann testified that she asked Mr. Gober two or three times to attend marriage counseling. Mr. Gober conceded that he declined to go, but contended that Ms. Hirschmann only asked him once. Ms. Hirschmann conceded that she did not tell Mr. Gober she wanted a divorce, or that she had bought a mobile home so she could move out. She asserted that she was scared to tell him "[b]ecause [she] was afraid to... [b]ecause of his anger." Ms. Hirschmann stated that Mr. Gober was verbally abusive to her "[a]ll the time" and that he was physically abusive towards her twice. Mr. Gober denied that he was physically abusive to Ms. Hirschmann and argued that Ms. Hirschmann remaining in the home for a month after he was served was inconsistent with her statements that she was afraid of him.

Following trial on the issue of fault, the trial court found that Ms. Hirschmann was not at fault for the breakup of the marriage. To the contrary, the trial court affirmatively found that Mr. Gober was the party at fault. The trial court provided an extensive explanation in support of this finding. Regarding Mr. Gober's statement that he did not want Ms. Hirschmann to have surgery, the trial court commented, "how

---

[6] Mr. Gober also testified that Ms. Hirschmann smoked marijuana with him. Ms. Hirschmann said she could not have smoked because she is drug tested regularly by her doctors.

8

considerate were you with that." The trial court further found Mr. Gober "incredible" regarding his testimony about how often the parties had sex. The trial court specifically stated:

> The leaving the bedroom however, I don't think it had anything to do with her denying you sex, I think it had everything to do with her unrefuted testimony that after she had back surgery and you and her and the two dogs in the same bed didn't work. And so she moved to a bed that was more comfortable for her. Unrefuted. You didn't offer any testimony to refute that... [T]hat didn't cause or prevent you guys from having a physical relationship.

The trial court also explicitly found that "I don't think how she left caused the breakup of the marriage. I think how she left is explained by some of the things that were going on." The trial court explained as follows in oral reasons:

> So when I come down to whether I think this lady was at fault for the breakup of the marriage, I do not think anything you would've testified to or anything that I heard today suggests to me that she was at fault for the breakup of the marriage. She had some medical problems, and you were the kind of husband that -- you were distant. Either you were physically not there, or you were emotionally unavailable to her. You had no consideration even as you testified here today for her physical loss... She had sex with you when she could, but that was not the reason why your marriage broke up. Your marriage broke up because you were unwilling to get help for anything that was the cause... You even said it yourself[:] I know it was bad, and I knew it might lead to divorce, but I didn't do anything different... Your wife asked you... to go to counseling. You didn't want to go. That's the kind of help that would've supported [the marriage].

With the manifest error standard of review in mind, we note that the parties presented conflicting evidence, as detailed herein. In such circumstances, one of the basic tenets of the manifest error standard of review is that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently." **Hall v. Folger Coffee Co.**, 2003-1734 (La. 4/14/04), 874 So.2d 90, 99. Having thoroughly reviewed this record in its entirety, including the evidence and testimony of the parties, we cannot say that the trial court was manifestly erroneous in finding Ms. Hirschmann free from serious fault that contributed to the dissolution of the marriage. This assignment of error lacks merit.

Mr. Gober's second assignment of error claims that the record reflects that the trial court demonstrated bias and prejudice from the opening of the hearing and

9

throughout the presentation of the evidence, which denied him a fair trial. Louisiana Code of Civil Procedure article 154 provides that a party desiring to recuse a judge of a district court shall file a written motion assigning the ground for recusation. The motion must be filed prior to trial or hearing, unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment. LSA-C.C.P. art. 154. In this matter, Mr. Gober failed to file a motion seeking the recusal of the trial court prior to judgment. Thus, the issue of the trial court's bias is not properly before this Court.

## CONCLUSION

The September 11, 2019 judgment finding Ms. Hirschmann free from fault in causing the parties' divorce is affirmed. Costs are assessed to Mr. Gober.

**AFFIRMED.**